UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY PETERSON,
on behalf of *K.D.P.*,

    Plaintiff,                         Civil Action No. 15-14430
                                          Honorable Judith E. Levy
            v.                          Magistrate Judge Elizabeth A. Stafford

NANCY A. BERRYHILL[1],
Acting Commissioner of
Social Security,

    Defendant.
_____/

**REPORT AND RECOMMENDATION ON CROSS-
MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 10, 13]**

    Plaintiff Kimberly Peterson, on behalf of her minor son K.D.P, appeals a final decision of Defendant Commissioner of Social Security ("Commissioner") denying K.D.P.'s application for supplemental security income benefits (SSI) under the Social Security Act. Both parties have filed summary judgment motions, referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After review of the record, the Court finds that the administrative law judge's (ALJ) decision is

---

[1] This substitution is made pursuant to Federal Rule of Civil Procedure 25(d).

supported by substantial evidence, and thus **RECOMMENDS** that:

- the Commissioner's motion [ECF No. 13] be **GRANTED**;
- Peterson's motion [ECF No. 10] be **DENIED**; and
- the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

**I.   BACKGROUND**

**A.   K.D.P.'s Background and Disability Application**

Born in December 1999, K.D.P was thirteen years old when Peterson filed his application for disability benefits on May 3, 2013. [ECF No. 7-5, Tr. 187, 195]. Peterson alleges that he is disabled by narcolepsy with an onset date of November 18, 2012. [ECF No. 7-3, Tr. 84]. After a hearing on May 6, 2014, which included the testimony of Peterson on K.D.P.'s behalf, the ALJ found that he was not disabled. [ECF No. 7-2, Tr. 35, 53-76]. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner, and Peterson timely filed for judicial review. [*Id.*, Tr. 1-4; ECF No. 1].

**B.   The ALJ's Application of the Disability Framework**

A child under the age of 18 will be considered disabled if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner determines whether a child is disabled by analyzing three sequential steps, assessing: (1) whether the child is engaged in "substantial gainful activity"; (2) whether the child has any "severe" impairments;[2] and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924(a); *Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 573 F. App'x 461, 462 (6th Cir. 2014).

In analyzing functional equivalence, the ALJ examines the effects of a claimant's impairments on six behavioral domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *Barnett*, 573 F. App'x at 464; 20 C.F.R. § 416.926a(b)(1). A claimant's impairments "functionally equal the listings" if they result in "'marked' limitations in two domains" or "an 'extreme' limitation in one domain." § 416.926a(a).

Applying this framework, the ALJ concluded that K.D.P. was not

---

[2] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 920(c).

3

disabled. At the first step, she found that K.D.P. had not engaged in substantial gainful activity since the application date. [ECF No. 7-2, Tr. 38]. Next, the ALJ determined that K.D.P. had the severe impairment of narcolepsy. [*Id.*]. At the third step, she concluded that K.D.P.'s impairment did not meet, medically equal, or functionally equal the severity of the listed impairments. [*Id.*]. In assessing the six functional equivalence domains, the ALJ found that K.D.P. had "less than marked" limitations in five domains (acquiring and using information, attending and completing tasks, interacting and relating with others, caring for yourself, and health and physical well-being) and "no limitation" in the remaining domain (moving about and manipulating objects). [*Id.*, Tr. 41-46]. As a result, K.D.P. was found not disabled. [*Id.,* Tr. 47].

## II. STANDARD OF REVIEW

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241

4

(6th Cir. 2007) (internal quotation marks and citation omitted).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards. "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723. *See also Rogers*, 486 F.3d at 249. In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

The Commissioner must also adhere to its own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless. *Id.* at 655-56. On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless. *Id.*; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Gentry*, 741 F.3d at 729.

**III.   ANALYSIS**

Peterson argues that the ALJ failed to obtain a medical opinion on the issue of medical equivalency; that K.D.P.'s abilities in acquiring and using information, as well as in attending and completing tasks, were markedly limited; and that the ALJ violated the treating physician rule. The Court disagrees and recommends that the Commissioner's motion be granted and the ALJ's decision affirmed.

**A.**

SSR 96–6p "requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996). For childhood disability claims, a medical opinion is required for determination of medical equivalence, but not for functional equivalence. *See* Social Security Administration's "Hearings, Appeals & Litigation Law Manual" ("HALLEX") I-5-4-30, 1993 WL 13011402, at *3 (March 19, 1993) ("It is OHA's longstanding policy to require ALJs and the AC to obtain opinions on medical equivalence from medical experts. However, because of the kind of equivalence determinations required in childhood disability

claims, the ALJ or AC may not need to obtain medical expert opinion to decide the issue of functional equivalence.").

Here, the record contains a medical opinion that was jointly signed by state agency consultants Jerry Evans, M.D. (pediatrics) and Zahra Khademian, M.D. (child and adolescent psychiatry). [ECF No. 7-3, Tr. 86-89]. They found that K.D.P. suffered a severe impairment, but that it did not meet, medically equal, or functionally equal any listing. [*Id.*]. Peterson cites to SSR 96-6P, which requires that the ALJ obtain an updated medical opinion when additional medical evidence is received. 1996 WL 374180 (S.S.A. July 2, 1996). But this is only the case where new evidence "in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding" of no equivalency. *Id.* "An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter,* 279 F.3d 348, 355 (6th Cir. 2001). The ALJ gave the opinion of Dr. Evans and Dr. Khademian great weight, and though she found their functional equivalence findings not entirely accurate based on evidence received subsequent to their opinion, there is no indication that the additional evidence showed that K.D.P.'s impairments were medical equivalent to a listing. The ALJ did not abuse her discretion in declining to obtain an updated medical opinion on

the issue.

**B.**

As noted above, a finding of functional equivalency to a listing is dictated if a claimant's impairments result in marked limitations in two of the six listed behavioral domains. § 416.926a(a). Peterson argues that K.D.P. had marked limitations in the domains of "acquiring and using information" and "attending and completing tasks," whereas the ALJ found less than marked limitations in these and other domains.

### 1. Acquiring and Using Information

A marked limitation is found when "your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities." § 416.926a(e)(2)(i). Examples of "limited functioning" in acquiring and using information – but not necessarily "'marked' or 'extreme' limitation[s]" – include: inability to understand words about space, size, or time (e.g., in/under, big/little, morning/night); inability to rhyme words or the sounds in words; difficulty recalling important things learned in school yesterday; difficulty solving mathematics questions or computing arithmetic answers; and talking only

in short, simple sentences and having difficulty explaining what you mean. § 416.926a(g)(3).

In finding that K.D.P. was less than markedly limited in acquiring and using information, the ALJ noted that his most recent report card showed grades of "all As and Bs" (though he earned C+ in art class). [ECF No. 7-2, Tr. 41, citing ECF No. 7-7, Tr. 332]. She also cited a July 2013 questionnaire answered by K.D.P.'s sixth grade teacher stating that he had only slight problems with "comprehending and doing math problems" and "learning new material," and otherwise had no problems in the realm of acquiring and using information. [ECF No. 7-6, Tr. 209-10]. The ALJ gave great weight to these questionnaire responses, as well as to the opinion of Dr. Evans and Dr. Khademian that K.D.P. had less than marked limitations in acquiring and using information.

Peterson contends that K.D.P.'s December 2012 psychoeducational assessment, completed by school psychologist Muna Mashrah, M.A., indicated marked limitations due to his need for additional assistance in the classroom, and that his math and English teachers indicated that he had issues paying attention, completing his work, and falling asleep in class. [ECF No. 7-7, Tr. 252-61]. But even in that assessment, he was found not in need of special education, and that there was "no presence of significant

9

academic underachievement in reading and mathematics," [*Id.*, Tr. 248-49], and that assessment was made before K.D.P. was diagnosed with narcolepsy and began treatment in early 2013. [*Id.*, Tr. 269-71, 273, 285-88]. Peterson testified that, since that treatment began, his grades have improved "tremendously." [ECF No. 7-2, Tr. 59]. And the November 2013 medical record, which is the most recent, indicated that his "excessive daytime sleepiness" was better, his Epworth score (a measure of sleepiness) had reduced from 21 to 7, and his medication was not in need of adjustment. [ECF No. 7-7, Tr. 322-23].

### 2. Attending and Completing Tasks

Deficiencies in attending and completing tasks can be shown where a child: is "easily startled, distracted, or overreactive to sounds, sights, movements, or touch"; is slow to focus on or fails to complete activities of interest (e.g., games or art projects); repeatedly becomes sidetracked from activities or frequently interrupts others; is easily frustrated and gives up on tasks, including ones he or she is capable of completing; and requires extra supervision to stay engaged in an activity. § 416.926a(h)(3).

In finding that K.D.P.'s limitation in attending and completing tasks was less than marked, the ALJ again noted his teacher's July 2013 questionnaire responses, which indicated in that domain only a slight

problem in "carrying out multi-step instructions" and "completing work accurately without careless mistakes." [ECF No. 7-7, Tr. 211]. The other eleven activities in the domain were rated "no problem." [*Id.*]. Dr. Evans and Dr. Khademian had assessed no limitation in this domain, but the ALJ found that evidence subsequent to that opinion justified a finding of "less than marked" limitation. [ECF No. 7-2, Tr. 47].

Peterson cites a letter from K.D.P.'s treating physician, Amal Omran, M.D., from October 2013 in which he describes the general characterizations of narcolepsy and states that a narcoleptic individual "often has excessive daytime sleepiness that interferes with their ability to concentrate and perform daily functions." [ECF No. 7-7, Tr. 317]. But these generalized descriptions do not describe K.D.P.'s individual functional limitations, and Dr. Omran's specific findings regarding K.D.P. (as described below) support the ALJ's assessment.

For these reasons, the ALJ's determination that K.D.P is not markedly limited in the areas of "acquiring and using information" and "attending and completing tasks" is supported by substantial evidence.

## C.

Lastly, Peterson contends that the ALJ failed to give appropriate weight to K.D.P.'s treating physician, Dr. Ormran. The "treating physician

11

rule" requires an ALJ to give controlling weight to a treating physician's opinions regarding the nature and severity of a claimant's condition when those opinions are well-supported by medically acceptable clinical and diagnostic evidence, and not inconsistent with other substantial evidence. *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43.

Dr. Omran began seeing K.D.P. in January 2013, when he ordered testing that led him to diagnose "narcolepsy without cataplexy" in April of that year. [ECF No. 7-7, Tr. 269-71, 285-88]. Peterson claims that Dr. Orman's clinic letter dated October 10, 2013 is an opinion that the ALJ failed to properly evaluate. [*Id.*, Tr. 324-26]. She states that the letter demonstrates that K.D.P. still requires two to four power naps during the day and that he falls asleep in class, and that this napping causes marked limitations in his ability to acquire and use information, and to attend and complete tasks. [ECF No. 10, PageID 390-91]. Contrary to Peterson's argument, the October 2013 letter and other records from Dr. Omran do not evidence marked deficiencies.

In the letter, Dr. Omran and Jairo Barrantes, M.D., state that K.D.P. was taking one unscheduled nap during class hours and a second after returning home. [ECF No. 7-7, Tr. 325]. The letter further states that K.D.P. "reports adequate school performance" and that "his mother only

had one letter from the school so far that he was napping during class time. Otherwise, he does not have any other complaints." [ECF No. 7-7, Tr. 325]. And at K.D.P.'s follow up appointment in November, his situation seemed to have improved greatly. K.D.P and his mother "say that he is doing better. He is less sleepy than before. . . . He naps during the recess time in school as well as after returning from school at 5 p.m. for 30 minutes." [*Id.*, Tr. 322]. The Ritalin dosage structure as set in October seemed to be working and no changes to it were made. [*Id.*].

The ALJ accurately summarized Dr. Omran's findings that throughout 2013, as his treatment progressed, K.D.P. began having less daytime sleepiness, showed improvement in his academic scores, slept more at night, and napped less during the day. [ECF No. 7-2, Tr. 40]. Peterson has not shown that Dr. Omran or any other doctor rendered opinions specifically regarding the six behavioral domains, or that Dr. Omran's records conflict with the ALJ's overall assessment of K.D.P.'s functionality in those domains. The ALJ did not violate the treating physician rule.

### III. CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that Peterson's Motion for Summary Judgment [ECF No. 10] be **DENIED**, the Commissioner's Motion [ECF No. 13] be **GRANTED**, and the ALJ's

decision **AFFIRMED**.

                                                                                s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: February 15, 2017

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after

14

service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 15, 2017.

                                        s/Marlena Williams
                                        MARLENA WILLIAMS
                                        Case Manager